JOHN F. HARTSHORN *vs.* INHABITANTS OF SOUTH READING.

A bill in equity for the abatement of a nuisance to a highway cannot be maintained by one whose land does not abut thereon, and who is only injured in common with others by being deprived of the use of the highway, although his injury is greater in degree than that of others.

A demurrer to a bill in equity for the abatement of a nuisance to a right of way will be sustained, if it appears on the face of the bill and by reference to an annexed plan that the easement which actually exists is of less extent than that which is therein averred to exist, and that the existing easement is not injured.

Hartshorn *v.* Inhabitants of South Reading.

Under an ancient vote of a town that certain common lands bounding upon a pond and crossed by two highways, "shall continue to lie unfenced as they are, for the use of the old parish, for highways, a training field, and burying-place, and the more common coming at the pond with flax and creatures, and also to accommodate the neighbors that live bordering on said lands for their more convenient coming at and improving their own lands and buildings; all the aforesaid lands to remain unfenced as they now are, and to the use of the old parish and neighborhood aforesaid forever, never to be disposed of for any other use whatsoever, without the consent of every freeholder in the parish," the extent of the private easement of the owners of the adjoining lands is a right of passage over so much of the common lands as is reasonably sufficient for coming to their lands and buildings and for access to the pond.

BILL IN EQUITY, setting forth that the plaintiff is the owner of a parcel of land in South Reading, with his dwelling-house thereon, lying westerly of and abutting upon the public common which is south of the pond, as appears by an annexed plan; that in 1741 the town of Reading passed the vote, which is copied in the opinion of the court, p. 504; that the old parish referred to in said vote was the first parish of Reading, and its territory was incorporated as the town of South Reading; that the common lands referred to were then unfenced, and have ever since continued so; that there is an ancient public highway called Common Street, legally located, and running across the common, which affords the only access by public highway to the plaintiff's land; that he had the right, for himself and family and servants, in all directions to pass and repass over and across the said common to and from his own land, and to drive his creatures directly to the pond, across the common and through pond lane, which was a part thereof, and to pass and repass over all parts of said common, and that all the persons living on lands bordering on said common have the same rights and easements; that the defendants in May and June 1860 voted in town meetings to fence the said common, running the westerly line of the fence within sixty feet of the westerly line of the common, in front of his house, and diagonally across Common Street, and chose committees and agents to carry said votes into effect, and in the following September voted to discontinue Common Street; that the plaintiff, a citizen of South Reading and a freeholder in the parish, never consented thereto; and praying for an injunction and other relief.

The following plan shows the situation of the premises, **the** proposed fence being indicated by dotted lines.

*H. G. Herrick*, for the defendants.

*S. G. Nash*, for the plaintiff, cited *Emerson* v. *Wiley*, 10 Pick. 310 ; *Pomeroy* v. *Mills*, 3 Verm. 279; *Abbott* v. *Mills*, Ib. 521 ; *State* v. *Catlin*, Ib. 530 ; *Commonwealth* v. *Rush*, 14 Penn. State R. 186; *Cincinnati* v. *White*, 6 Pet. 431; *Brown* v. *Manning*, 6 Ohio, 298; *Stetson* v. *Faxon*, 19 Pick. 147 ; *Soltau* v. *De Held*, 9 Eng. Law & Eq. R. 104.

Hoar, J. The plaintiff rests his case upon two grounds. 1. That the inclosure of the common by the defendants has shut up, and deprived him of the use of, a highway, and has caused him a peculiar and special injury thereby, different from that sustained by the community at large; and 2. That it has interfered with the enjoyment of certain easements appurtenant to his land abutting upon the common, and thus occasioned a private nuisance to his estate for which he is entitled to equitable relief.

The first ground cannot be maintained, according to the well settled doctrines of this court. The plaintiff's land does not abut upon the highway described; and although from its proximity his occasion to use it is more frequent, and the inconvenience to him from its obstruction greater, than that which all other persons desiring to travel over it have or experience, this is a difference in degree only, and not in kind. He is merely disabled from going upon and using it as a highway, a disability common to the whole community; and the remedy is by indictment. *Brainard* v. *Connecticut River Railroad*, 7 Cush. 506. *Harvard College* v. *Stearns*, 15 Gray, .

The obstruction of the enjoyment of a private easement stands on a different footing; and for a permanent and continuous injury, occasioned by such an obstruction, a bill in equity undoubtedly furnishes an appropriate remedy.

The plaintiff alleges the existence of such an easement appurtenant to his land, under a vote of the town of Reading passed in 1741, and recited in the bill; and the nature and extent of this easement is the chief subject of controversy between the parties. That vote was as follows : " That all the common lands " [a description of which is given,] " shall continue to lie unfenced as they are," [with a slight exception mentioned,] " for the use of the old parish, for highways, a training field, and burying-place, and the more common coming at the pond with flax and creatures, and also to accommodate the neighbors that live bordering on said lands, for their more convenient coming at and improving their own lands and buildings ; all the aforesaid lands to remain unfenced as they now are, and to the use

of the old parish and neighborhood aforesaid forever, never to be disposed of for any other use whatsoever, without the consent of every freeholder in the parish."

The old parish, which was the first parish in Reading, was a territorial parish which in 1812 was incorporated as the town of South Reading. The tract of land described in the vote of 1741 was crossed by two highways, and continued unfenced until the time of the filing of this bill, when the town of South Reading, having previously voted to do so, proceeded to inclose the central part of the tract, leaving, however, a space all round the inclosure sufficient for a convenient way, and for access to the pond, and for coming at and improving the lands bordering upon the common.

It is not necessary for the decision of this case to determine the precise effect of the vote of 1741, in relation to the title of the common land in question. Whether that vote would convey the fee of the land would be at best doubtful, and might depend upon facts not fully presented by the demurrer to the bill. *Green* v. *Putnam*, 8 Cush. 21. The grant was hardly such an one as the parish could take in its parochial capacity, and it seems to have been rather intended as an appropriation by the town of its land to certain uses, without any grant of the land itself, for the accommodation of the inhabitants of that locality, perhaps in reference to a probable division of the town at some future period. A burying-ground is not usually so much a parochial as a municipal charge; and a training field and highways do not come within the class of objects contemplated in the organization of a parish. If all the facts were presented it might very likely be found that this vote of the town of Reading was one of several votes passed in the same year, respecting the use and disposition of its common lands lying in different parts of the town, the construction and intent of which were considered by this court in the case of *Bachelder* v. *Wakefield*, 8 Cush. 243. It appeared in that case that in March 1807 the town voted to confirm the title of each parish to the common lands lying within their respective limits.

But whether the original grant be regarded as a conveyance

of an interest or easement only, reserving the fee in the town, or as a grant of the fee upon condition; and whether the old parish did or did not acquire the fee by the vote of 1741, or by any subsequent confirmation; and without considering how far the town of South Reading has succeeded to any rights of the town of Reading, or of the old parish, in property appropriated exclusively to municipal uses within its territory, we are of opinion that this demurrer must be sustained, because the right of the plaintiff under the vote is not of so large extent as he has assumed and averred in his bill. He claims that, as the owner of land fronting upon the common, he has a right of way over it, and over every part of it, in all directions. This seems to us inconsistent with the just interpretation of the vote of 1741, and with the other rights which it created. The common land was thereby devoted to the use of a training field, of highways, of a burying-ground, of access to the pond with flax and creatures, and for the accommodation of the neighbors for their more convenient coming at and improving their own land and buildings. These are separate uses, and are to be so defined and limited as not to be inconsistent with each other. It is not to be supposed that the same land could be used for a highway and also for a burial-ground. The part appropriated for highways must necessarily be subject to the control of the public authorities, under the general provisions of law relating to the maintenance and repair of ways; and any ways laid out might be afterward discontinued, altered, raised, lowered, inclosed with a railing, or treated in any manner which the safety and convenience of the public might require. It would not be lawful to interfere with the reasonable use of such highways by the public, by occupying them as a training field. On the other hand, the parish or town would have had no right to appropriate the common immediately in front of and adjoining the land of an abutter to the purpose of a burying-ground, so as to interrupt and disturb his access to his land and buildings. And in like manner the owners of the adjoining land would have no right to travel or drive their cattle over or among the graves and monuments of the burying-ground. The extent of their

easement is a right of passage over so much of the common as is reasonably sufficient for coming to their lands and buildings, and for access to the pond ; and this the facts stated in the bill, in connection with the plan referred to, show to have been left un-obstructed.   If the statement in the vote of 1741, that the lands are " to remain unfenced as they now are," means anything more than an agreement that they shall remain as common lands, not divided among private persons, or appropriated to any private use, the circumstances under which it was passed would rather indicate that it was intended merely to renounce the right of the town to fence it, and not to restrain the erection of a fence by those to whose use it was devoted, if it would make the use more beneficial, and not interfere with the enjoyment of the rights which were granted.   *Wellington & others, Petitioners,* 16 Pick. 87.   But however this may be, it is immaterial to the present inquiry, because the easement belonging to this plaintiff is not in any degree impaired.

The case of *Emerson* v. *Wiley,* 10 Pick. 310, does not conflict with the conclusion to which we have come.   In that case the defendant pleaded a right of way in all directions over the plaintiff's close, and the jury found that he was entitled to such a way.   The plaintiff's close was a part of the common land described in the vote of 1741 above recited, and immediately adjoining the defendant's land ; and the plaintiff claimed under a deed from the parish.   But by inclosing the plaintiff's land, the defendant was wholly deprived of the privilege of fronting and bounding upon the common.   That privilege belonged to his whole front line ; and neither the plaintiff nor the parish could cut him off from it in any direction.   There was nothing in the case to raise any question as to the right of the parish or the town to inclose the burying-ground or training field, if a reasonable portion of the common were left for access to the adjoining lands, and to the pond.

At the request of the parties, we have decided this case upon the substantial merits of the title on which the plaintiff relies, without regard to the technical effect of the demurrer in respect to the formal averments contained in the bill.

*Demurrer sustained, and bill dismissed*